1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN J. CAMPBELL, | ) 1:09-cv-00465 GSA |
| | ) |
| | ) |
| Plaintiff, | ) **ORDER REGARDING PLAINTIFF'S** |
| | ) **SOCIAL SECURITY COMPLAINT** |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Steven Campbell ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 12 & 15.)

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff protectively filed an application for disability insurance benefits on November 24, 2003, alleging disability beginning October 15, 2003, involving diabetes, back pain, and mental problems.  AR 278-280, 722-723.  Plaintiff's application was denied initially, upon reconsideration, and by an Administrative Law Judge ("ALJ") following a hearing.  AR 174-175, 722-723, 729-739.  Subsequently, the Appeals Council granted Plaintiff's request to review the ALJ's decision pursuant to the substantial evidence provision of  Title 20 of the Code of Federal Regulations sections 404.977 and 416.1477.  AR 746.

On February April 27, 2007, the Appeals Council issued its decision finding that the ALJ's disability determination was not supported by substantial evidence.  The Appeals Council held:

> The claimant's severe impairments were found to include back pain, obesity, diabetes mellitus, and a schizoaffective disorder.  The claimant's mental limitations were found to be: limited to simple repetitive tasks, limited public and co-worker contact, no team work.  Although concluding that the claimant has a severe mental impairment, there was no rating of the severity of that impairment pursuant to 20 CFR 404.1520a and 416.920a.
> Exhibit 3F includes a diagnosis of borderline intellectual functioning, with a VIQ of 69, PIQ [of] 78, and FSIQ [of] 71.  The decision contains no discussion of the borderline IQ finding, or of whether or not the record establishes deficits in adaptive behavior prior to age 22, as required by Listing 12.05C.  Consideration of the findings in Exhibit 3F, and Listing 12.05C is required for the decision to be supported by substantial evidence.
> The [ALJ] found that claimant's impairments are not as limiting as he alleges.  Exhibit 16E and 11E contain lay statements which were not considered.  Further evaluation of credibility is required.

AR 746.  On remand, the Appeals Council directed the ALJ to: (1) further evaluate the claimant's mental impairment in accordance with Title 20 of the Code of Federal Regulations sections 404.1520a and 416.920a, and to document the application by providing specific findings and appropriate rationale for the functional areas described in Title 20 of the Code of Federal Regulations sections 404.1520a(c) and 416.920a(c); (2) specifically address claimant's borderline intellectual functioning in relation to the Listing

---

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

of Impairments contained in Appendix 1 of Subpart P of Part 404; and (3) further evaluate claimant's subjective complaints pursuant to the Code of Federal Regulations sections 404.1529 and 416.929, as well as Social Security Regulation ("SSR") 96-7p. Additionally, the Appeals Council specifically called for the ALJ to address all lay witness statements, and if said testimony was discounted, to provide reasons germane to each witness.  AR 747.

In accordance with the Appeals Council's remand instruction, ALJ William C. Thompson, Jr. held a hearing on July 8, 2008.  On August 15, 2008, the ALJ issued an order denying benefits.  AR 19-31.  On January 30, 3009, the Appeals Council denied review of the July 2008 determination.  AR 11-13.

**Hearing Testimony of July 8, 2008**

On July 8, 2008, in Stockton, California, ALJ Thompson held a second hearing in accordance with the directive from the Appeals Council.  AR 130-171.  Plaintiff and his representative Frederick Yucht[3] were in attendance.  AR 132.  Vocational Expert ("VE") Susan Moranda appeared telephonically.  *Id*.  During the hearing, the ALJ elicited testimony from Plaintiff and VE Moranda.  *Id*.  The entire hearing testimony of July 8, 2008, was reviewed by the Court.  Only those portions relevant to the issues on appeal are summarized below.  Otherwise, the testimonial evidence will be referenced as necessary in this Court's decision.

*VE Susan Moranda*

During the course of the hearing, the ALJ and Plaintiff's representative elicited testimony from VE Moranda.  AR 164-170.

---

[3]Mr. Yucht is identified as Plaintiff's attorney throughout the transcript.  Nonetheless, a review of the State Bar of California's website reveals that Yucht is disbarred: http://members.calbar.ca.gov/fal/Member/Detail/78973.  Therefore, this Court presumes Yucht appeared as a representative, rather than attorney, in these proceedings, although the Court was troubled that Yucht made no effort to ensure the record was accurate as to his representative status.

After obtaining a stipulation as to the VE's competency, the ALJ asked the VE to characterize Plaintiff's past work as a laborer on a turkey farm, a landscape gardener, and a painter, pursuant to the Dictionary of Occupational Titles ("DOT"). AR 165. The VE classified Plaintiff's work as a laborer on a turkey farm as "a general laborer has a DOT code of 869.664-014. It's typically unskilled, SVP 2, and it's typically medium as it's performed in the national economy." *Id*. As to Plaintiff's past work as a landscape gardener, the VE classified it as "DOT code of 408.161-010 . . .. It's a skilled job and it's heavy, but I, I don't know that he worked at that high of a skill level." *Id*. Finally, the VE classified the painter position as "DOT code of 749.684-038. It's semi-skilled, SVP 4, and it's typically medium exertion as it's performed in the national economy." AR 166. Having classified Plaintiff's past relevant work, the ALJ proceeded to pose several hypothetical questions to the VE. AR 166-168.

First, the VE was asked to assume a hypothetical worker that is "[thirty-one] year-old individual, educated to the eighth grade, who is literate and has that past work." AR 166. The VE was asked to further assume the individual was capable of lifting fifty pounds occasionally and twenty-five pounds frequently, as well as standing and walking in combination for at least six hours in the workday, but limited to work involving simple instructions and limited contact with the public. Finally, the VE was also asked to assume the hypothetical worker should not work at heights or around hazardous moving machinery, or be exposed to excessive amounts of respiratory irritants (i.e., dust, fumes, smoke, etc.). *Id*. The ALJ asked the VE for any jobs that would be available to a person with the above limitations. AR 166-167. In response to these limitations, the VE identified three positions: (1) hand packager, DOT 920.587-018, a unskilled and medium exertional level position with an SVP 2 score, and with approximately 200,000 persons employed in that position throughout California; (2) fast food worker, DOT 311.472-010, also a unskilled and medium exertional level position with an SVP 2 score, and approximately 11,000 persons employed in that occupation, presumably throughout

California[4]; and (3) small parts assembler, a unskilled and light exertional level position with an SVP 2 score, and approximately 97,000 persons employed in that position throughout California.  AR 167.  The ALJ ensured the jobs referenced by the VE were consistent with the DOT.  AR 168.  Thereafter, the ALJ invited the Plaintiff's representative to pose any additional hypothetical questions of the VE.  *Id.*

Plaintiff's representative posed three additional hypothetical questions, each building upon the former.  AR 168-170.  First, the VE was asked to further assume the hypothetical worker's ability to "relate with coworkers is poor, to deal with the public is poor, to deal with work stress is poor, to functions independently is poor, [and] to maintain attention and concentration is poor."  AR 168.  Plaintiff's representative then proposed to define the use of "poor" in this hypothetical as "less than satisfactory,"[5] and asked the VE if the job base she identified earlier would erode given these additional limitations.  AR 168-169.  "With all those poor impairments, it would severely erode the job base . . . because those are primary functions.  You have to exhibit acceptable behavior . . . and interaction in those areas, even for, for very unskilled work," replied the VE.  AR 169.

A second hypothetical was posed within which the worker was also limited by "a poor ability to accept criticism from a supervisor."  AR 169.  "Yes, you have to have . . . a social ability . . . to be able to accept criticism and instruction from a supervisor at all times.  And you would have to have appropriate response and behavior," the VE answered.  *Id.*

---

[4] The VE did not explicitly state that the 11,000 individuals employed in this position were in California, but it is a logical presumption given the availability of the other two positions testified to by the VE were explicitly limited to California.  AR 167.

[5] The ALJ subsequently corrected Plaintiff's representative on the definition of "poor" as contemplated by the assessment form, which defined it as "seriously limited but not precluded." AR 170.  This change, however, made no impact on the VE's testimony as she interpreted Plaintiff's definition of poor to be consistent with the assessment forms definition: "the seriously limited usually was at the culmination that individual wouldn't be able to function at an acceptable level on a daily basis on a full time job."  *Id.*

In a third hypothetical, Plaintiff's representative asked the VE to assume the hypothetical worker was illiterate and whether illiteracy would have an effect.  AR 169-170.  "Well, it, it always does have an effect.  The particular jobs that I did cite, literacy isn't a huge factor.  Particularly the small parts assembler.  And after training, I don't think that's a huge factor.  But of course it can be an impairment," the VE responded.  AR 170.

**Medical Record**

The entire medical record was reviewed by the Court.  Only those portions relevant to the issues on appeal are summarized below.  Otherwise, the medical record evidence will be referenced as necessary in this Court's decision.

***Baha Abu-Esheh, M.D.***

On December 14, 2002, Plaintiff was examined by Dr. Abu-Esheh in accordance with Plaintiff's claim for disability in the State of Oklahoma.  AR 390-397.  At the time, Plaintiff's chief complaints involved morbid obesity, difficulty standing for long periods, trouble breathing, pain in the chest and back, as well as swelling in the legs and feet.  AR 390.  The examination also included Plaintiff's social and psychological history, as conveyed to the doctor by Plaintiff.  It notes he "[d]enies any smoking, alcohol use, or illicit drug use" and "[d]enies any mood swings, depressive moods or anxiety disorder.  No delusions or hallucinations."  AR 390-391.

Upon examination, the doctor noted that: Plaintiff was 450 pounds; his chest expansion was symmetrical bilaterally; his lungs were clear to auscultation bilaterally, without rales or wheezes; his heart sounds one and two were heard, without S3 or S4 gallops, and his heart rhythm was regular, with no murmurs or ventricular friction rub noted; both his ankles were swelling, but there was no cyanosis, clubbing, varicosities or point tenderness; his muscle strength, including grip, was equal bilaterally at 5/5 in both upper and lower extremities, and he was able to do both fine and gross manipulation with his fingers; he had a full range of motion noted in all extremities, without pain; pain was present in his lower back, but no muscle spasms were appreciable, and there was no

limitation in his back's range of motion, although pain was present through all ranges of motion; his mental status was awake, alert, and oriented "x3," no overt pathology was noted and his recent and remote memories were noted to be intact, and finally, while his gait was slow, there was no muscle atrophy.  Dr. Abu-Esheh did not provide a diagnosis or recommendation.  AR 391-392.

### M. Gerald Ball, Ph.D.

On January 9, 2003, psychologist M. Gerald Ball conducted a psychological evaluation.  AR 400-402.  Dr. Ball's evaluation noted that Plaintiff "was cooperative" and did not exhibit "extraneous movements."  AR 400.  He also noted that Plaintiff was "a large obese man . . . just over 500 pounds."  *Id*.  Plaintiff reported to Dr. Ball that: he had never been hospitalized for psychiatric problems; he started hearing voices when he was five years old and that at that time he was frequently sexually molested by an older sister; he has had past problems with drugs and alcohol, but has been clean and sober for four months; and that his only health problem was obesity.  *Id*.

Dr. Ball observed that Plaintiff "was not well oriented to time but did seem oriented to place and person.  His vision appears to be adequate.  His articulation is good.  He responded appropriately to conversational level speech and does not appear to have a hearing problem.  He did not walk with a limp or use a cane but did complain of periodic dizziness."  AR 400.

Dr. Ball then administered an IQ test.  AR 401.  Plaintiff was assessed a verbal IQ of 69, performance IQ of 78, and a Full Scale IQ of 71, thus placing him in the lower level of the Borderline range of intellectual functioning.  *Id*.  Dr. Ball concluded that "[b]ecause of his limited intellectual capacity, his considerable difficulty with arithmetic, and his inability to deal with people outside the home, it is my opinion that at the present time [Plaintiff] is not capable of handling benefits without assistance."  *Id*.

### Burnard L. Pearce, Ph.D.

On February 13, 2003, Dr. Pearce completed a Psychiatric Review Technique Form and explicitly considered the opinions of Dr. Ball and Dr. Abu-Esheh.  AR 412-

425.  Dr. Pearce opined that Plaintiff had "[p]ossible Borderline intellectual functioning."

AR 413.  With respect to substance addiction disorders, Dr. Pearce also indicated

"[b]ehavioral changes or physical changes associated with the regular use of substances

that affect the central nervous system."  AR 420.  The doctor also rated Plaintiff's

functional limitations, indicating that Plaintiff's daily living activities were subject to

mild limitation, his social function was moderately limited; maintaining concentration,

persistence, or pace was mildly limited; and he experienced no episodes of

decompensation.  AR 422.  Finally, Dr. Pearce opined in the Consultant Notes section

that:

> The history [Plaintiff] reported with respect to his mental health is less
> than completely persuasive.  He indicated to [Dr. Ball] that he is currently
> taking Zyprexa at bedtime.  It is surmised from his other statements that he
> is ostensibly taking the medication by reason of his report that he hears
> voices.  The other medical evidence, however, is not supportive of either
> his statement that he is taking Zyprexa or that he hears voices.  When seen
> [by Dr. Abu-Esheh] on 12-14-02 he reported to [Dr. Abu-Esheh] that he
> was not taking any medications and specifically denied experiencing any
> "mood swings, depressive moods, or anxiety disorder.  No delusions or
> hallucinations."  He also denied to [Dr. Abu-Esheh] that he had
> experienced any problems with drugs or alcohol.  Some weeks later,
> however, he reported initially to consulting psychologist that he did not
> have any problems with either drugs or alcohol but later indicated that he
> has such problems. . . . He was administered the Wechsler Adult
> Intelligence Scale-III and obtained a VIQ-69, PIQ-78 and a Full Scale IQ-
> 71.  These scores, if a valid representation of his abilities, would place his
> overall level of intellectual functioning within the lower limits of the
> Borderline range.  There is, however, reason to question the validity of
> these test results.  He obtained a scale score of 10 on the Picture
> Arrangement subtest which suggests that the claimant has some well-
> developed social skills and that he is able to anticipate and predict the
> actions of others.  This is not a skill that one normally sees in Borderline
> intellectual functioning or mildly retarded individuals.  The currently
> obtained test scores thus probably are not representative of the claimant's
> functioning and are an underestimate of his actual level of functioning.

AR 424.

In a mental residual functional capacity ("RFC") assessment dated February 13,

2003, Dr. Pearce opined that Plaintiff was not significantly limited in his ability to:

remember locations and work-like procedures; understand and remember very short and

simple instructions; carry out very short and simple instructions, maintain attention and

concentration for extended periods; perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to other without being distracted by them; make simple work-related decisions; complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  AR 426-427.

Dr. Pearce found Plaintiff moderately limited in a few areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to interact appropriately with the public.  *Id*.  In conclusion, Dr. Pearce opined that Plaintiff  "can understand, remember and carry out simple and some, but not all, detailed instructions under routine supervision.  He might have some difficulty relating to the general public in an in-depth ongoing fashion but can relate to supervisors and co-workers in an incidental manner."  AR 428.

### *2003 Physical RFC Assessment*

On January 17, 2003, a physical RFC assessment pertaining to Plaintiff was completed.  AR 429-436.  The consulting physician[6] identified the following exertional limitations: lift and/or carry twenty pounds occasionally, ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and an unlimited ability to push and/or pull.  To support this determination, the consulting physician stated "[t]his is a patient who alleges limitations

---

[6]While the assessment is signed, the Court cannot ascertain who completed the form on January 17, 2003, as the signature is illegible.

9

secondary to obesity, back pain, chest pain, and asthma.  He states he can prepare meals, do most all of the household maintenance, clean the house, do the laundry, do the dishes, and take out the trash.  There are no current physical findings from a [treating physician]."  AR 430.  No manipulative, visual, communicative or environmental limitations were identified.  AR 432-434.  On June 19, 2003, Shepard Fountaine, M.D., affirmed the assessment.  AR 436.

### *Tuolumne County Behavioral Health*

From June 12, 2003, through December 23, 2003, and again between the period of July 4, 2006, through June 3, 2008, Plaintiff received mental health treatment from Tuolumne County Behavioral Health.  AR 444-448, 642-666, 689-704.  During this period, he was evaluated by psychologist Lillian R. Boone, M.D.   AR 643, 685-688, 696-697.  Dr. Boone's evaluations, however, will be summarized separately below as they are best understood in a chronological context.

Alan Peters, M.D., in his initial evaluation of Plaintiff concerning treatment of his alleged schizophrenia, indicated that "[t]he Plaintiff] has not been on any kind of psycho tropic medication [for the last two weeks] and has become increasingly symptomatic, withdrawn, not sleeping well, having nightmares, having auditory hallucinations that are deprecatory in nature, etc."  AR 446.  Dr. Peters noted that "[h]istorically, the [Plaintiff] has never been psychiatrically hospitalized, all his treatment has been through outpatient services, apparently a place called Central Oklahoma Family Center in Konawa, Oklahoma."[7]

 Within the family history section of the initial evaluation, Dr. Peters states "[Plaintiff] denies any drug use, although he has in the past used amphetamine.  He

---

[7]The medical record evidence contains records from this facility.  AR 403-411.  However, the records are scant, consisting of physician's progress notes from four separate occasions dating from November 19, 2002, through January 23, 2003, and laboratory results.  *Id*.  The facility physician assessed Plaintiff initially with "psychosis of mixed psycho effective pattern," but later revised this assessment to a "schizophrenic disorder."  AR 404-405, 407.

smoked marijuana to help him sleep with the last couple of weeks as well." Within the

section entitled "Mental Status" Dr. Peters indicates:

> [Plaintiff is a] large obese man . . . hav[ing] a look of being pre-diabetic
> according his body habitus. His relatedness is distant. He makes good eye
> contact. Speech is soft, regulated, non-spontaneous. Psychomotor activity
> is reduced. Mood is dysphoric with an affect that is appropriate and
> constricted, no evidence for any tearfulness. The [Plaintiff] does not
> present with a formal thought disorder, although he does present as rather
> impoverished. He alludes to auditory hallucinations, although does not
> appear to be [afflicted] at this time. There is no suicidal []or homicidal
> ideation. Cognitively the patient presents as alert, oriented, with a clear
> sensorium. His insight is limited, judgement intact, reality testing intact.

AR 447. Dr. Peters' resulting diagnostic impression included "Axis I: Rule out

schizophrenia. Rule out Depressive Disorder with psychotic features. . . . Axis III: Pre-

diabetic (it should be noted that diabetes runs in the family). Axis IV: Psychological

stressors." AR 448. Finally, within the "Plan At This Time" section, Dr. Peters

indicated:

> It's my estimation that the [Plaintiff] would do well to resume the use of
> Risperdal which he says was much better than the Zyprexa, but at a
> slightly lower dose. [Plaintiff] said that the Risperdal not only quelled the
> auditory hallucinations, but it also made him feel calmer. [¶]
> Unfortunately, the likelihood of running into hyperglycemia with any of
> the antipsychotics is a likelihood. As such, the matter will be one of trying
> to balance one pathology against another."

*Id*.

The chart notes indicate that Plaintiff attended one session with Dr. Peters. *Id*.

On June 27, 2003, the facility attempted to telephone Plaintiff at his mother's house, but

was unable to speak to Plaintiff and instead left a message. On July 3, 2003, the facility

called again and set an appointment to review services on July 14, 2003. However, on

that date Plaintiff was a "no show." Then, on December 23, 2003, the facility "closed

[the] chart - lack of contact." The discharge summary reflects the same; it indicates that

Plaintiff attended a total of "1-3" sessions, and that his attendance was "irregular," and his

condition upon discharge was "[a]ssessment only." Consistently, the facility indicated

that none of the treatment goals were achieved and in the comments following this, they

state Plaintiff "did not follow through." AR 444.

From September 26, 2007, through June 3, 2008, Plaintiff participated in a group therapy class for sex offenders in accordance with his probation status.  AR 646-666, 689-704.  On April 8, 2008, Plaintiff's counselor indicated in his progress notes that "[Plaintiff] reports no problems with behavior, advises that new meds are really helping with sleep and mood -feels 'normal' he says, for first time in his life . . . avoids people in general, helps parents a bit, watches TV."  AR 701.  During his April 22, 2008 therapy session, the counselor indicated that Plaintiff was "maintaining status quo activities, most notably adding an interest in getting his driver's license, so is studying for his driving test . . . he hopes to be able to return to work with the turkey ranch operati[o]n."  AR 698.  On May 29, 2008, Plaintiff's counselor noted that Plaintiff was "keeping busy with hobby type activities; taking care of business for SSI process."  AR 695.  Later, on May 20, 2008, Plaintiff conveyed to his counselor that he was grappling with his "sex offender label" and the repercussions of that label; the counselor notes state "[Plaintiff] placing a lot of hope on SSI as his source of income at this juncture, as he recognizes his label will prevent most jobs from considering him."  AR 692.

### Manolito Castillo, M.D.

On January 31, 2004, Plaintiff underwent a psychological evaluation by Dr. Castillo, a board certified psychiatrist, in furtherance of a disability claim.  AR 449-453.  The report specifically identifies supplied medical records from Rehabilitation Clinic at Tuolumne General Hospital, Dr. Peters at Tuolumne County Behavioral Health, and the psychological evaluation conducted by Dr. Ball.  AR 449.  The chief complaints identified by Plaintiff were: back problems, schizophrenia, and depression.  *Id*.  After conveying psychiatric and personal histories, Plaintiff told Dr. Castillo that a doctor informed him that he had a "crushed vertebrae and required surgery," but that he did not have the means to pursue that treatment.  AR 450.  Plaintiff also reported that the impetus behind his seeking psychiatric treatment was his contemplation of suicide, but that "he feels [the psychiatric medicine] is presently helping him."  AR 450.  He also reported that he was not receiving psychiatric care at the time, but was receiving psychiatric

medication from his medical doctor.  Plaintiff denied a history of alcohol or drug abuse, however, the psychologist noted that on his previous assessment, Plaintiff admitted to using amphetamines and cannabis in the past.  AR 451.

Dr. Castillo's examination revealed that Plaintiff's posture, gait, and mannerisms were not within normal limits.  AR 451.  He observed that Plaintiff used a cane to ambulate and appeared to be in pain.  *Id*.  The doctor also noted the following: Plaintiff's social interaction with him was normal; he was oriented to the month, date, year, and city of the evaluation; able to recall six digits forward and three backwards, had difficulty with multiplication; attention span was normal; was not easily distracted and required no structural assistance from the doctor; was able to recite the days of the week in reverse; able to follow both a three-stage verbal command and a visual command; his memory was intact; was able to recall adequate details from his personal history; his mood was appropriate with no depressive symptoms observed; his thought processes were organized; he did not exhibit florid psychotic behavior, and his auditory hallucinations had decreased lately as an implied result of his taking anti-psychotic medication.  AR 451-452.

As a result of the above, Dr. Castillo diagnosed the following: schizophrenia, by history; major depressive disorder, by history; amphetamine and cannabis abuse, by history, in full remission; and a GAF score of 77.  AR 452.  Finally, Dr. Castillo noted that "[Plaintiff] also mentioned that, he is responding well to his medication and I expect his overall performance to improve more, as his medication reaches therapeutic dose. Since he did well on assessment, I am unable to identify any significant mental limitations at present . . ..  The above information is based on the [Plaintiff's] adequate performance with this evaluator."  AR 453.

### Michael Nwude, M.D.

On February 1, 2004, Plaintiff underwent a comprehensive internal medicine evaluation by family practice physician Michael Nwude.  AR 454-457.  The doctor reviewed the January 2003 psychological assessment of Dr. Ball, the initial psychological

evaluation notes of Alan Pitals, M.D. dated June 13, 2003, as well as the imaging report of Steven Hall, M.D., at Tuolumne General Hospital regarding Plaintiff's lumbosacral spine.  AR 454.

The evaluation includes a history of the present illnesses as related by Plaintiff, which indicated that "[c]urrently he is one medications for the back.  He says that these medications are helpful in alleviating his back pain. . . . the last time he saw his doctor he suggested surgery for his back, but he said got scared and refused to have the surgery."  It was noted Plaintiff's back pain occurred daily and he had to "use a walking cane."  AR 454-455.

Dr. Nwude's examination indicated that Plaintiff was obese and had difficulty mounting the examination table.  AR 455.  The doctor's examination regarding coordination, station and gait notes that "[Plaintiff] has a positive Romberg sign.  He was shaking and about to fall when I asked him to stand up. . . .  He could not do heel-to-knee maneuver because of his back pain . . . [w]alking cane is medically necessary for his back pain."  AR 456.  Regarding range of motion, Dr. Nwude's general findings indicate "[Plaintiff] has some tenderness in the lower back with paravertebral muscle spasm.  There is no other joint tenderness, crepitus, effusion, deformities, or trigger points."  Plaintiff's motor strength was normal.  AR 457.

The doctor's diagnosis included back pain secondary to old compression fractures of T11, T12, and L1 with secondary hypotrophic changes, schizophrenia, obesity, and angina pectoris.  AR 457.  The doctor's functional assessment included the following: Plaintiff could stand/walk for two hours out of an eight-hour day due to obesity and back pain; could sit for six hours out of an eight-hour day due to back pain; uses a walking cane as an assistive device; could lift/carry ten pounds occasionally; could occasionally bend stoop, and crouch due to marked postural limitations; could reach, handle, feel, grasp, and finger without manipulative limitation; no visual, communicative, or workplace environmental limitations were identified.  AR 457.

*2004 Physical RFC Assessment*

On February 17, 2004, a Physical RFC Assessment was prepared by Janice Thornburg, M.D.  AR 458-465.  The consulting physician identified the following exertional limitations: Plaintiff could lift/carry ten pounds occasionally, and less than ten pounds frequently; could stand/walk for two hours out of an eight-hour day; could sit for six hours out of an eight-hour day; was unlimited in his ability to push/pull; could occasionally climb, balance, stoop, kneel, crouch, and crawl.  AR 459-460.  No manipulative, visual, communicative, or environmental limitations were identified.  AR 461-462.  Also, while the doctor did find Plaintiff's symptoms attributable to a medically determinable impairment, she found the severity and duration of those symptoms was disproportionate to the expected severity or duration based on Plaintiff's medically determinable impairments.  AR 463-464.

The aforementioned findings were affirmed by Sadda Reddy, M.D. on May 24, 2004.  AR 465.

*Mario Morando, M.D.*

On March 3, 2004, Dr. Morando completed a second Psychiatric Review Technique Form.  AR 470-483.  The doctor indicated that Plaintiff's impairment does not satisfy the criteria for Listing 12.03, but noted schizophrenia by history.  Neither did Plaintiff's disorder meet the criteria for an affective disorder, yet major depressive by history was noted.  AR 473.  Dr. Morando found that Plaintiff has a mild functional limitation with regard to the activities of daily living and the ability to maintain concentration, persistence or pace.  AR 480.  The doctor assigned a moderate limitation as to Plaintiff's ability to maintain social functioning.  He found insufficient evidence to address episodes of decompensation.  AR 480.

In a mental RFC assessment dated March 3, 2004, Dr. Morando found Plaintiff was not significantly limited in his ability to remember locations and work-like procedures, or ability to understand and remember very short and simple instructions.  Plaintiff was moderately limited in understanding and remembering detailed instructions.

AR 466.  In the area of sustained concentration and persistence, Dr. Morando found

Plaintiff was not significantly limited in six of the eight areas; he was moderately limited

however regarding the ability to carry out detailed instructions and the ability to work in

coordination or proximity to others without being distracted by them.  AR 466-467.  With

regard to social interaction, Plaintiff was not significantly limited in his ability to ask

simple questions or require assistance, or ability to maintain socially appropriate behavior

and adhere to basic standards of neatness and cleanliness.  Plaintiff was moderately

limited regarding his ability to interact with the general public, accept instructions and

respond appropriately to supervisory criticism, and get along with coworkers or peers.

AR 467.  Finally, the doctor found Plaintiff was not significantly limited in the area of

adaptation.  AR 467.  It was noted with particularity that Plaintiff is able to understand,

remember and follow simple one and two step instructions, pay attention and concentrate

well enough to complete a work schedule, interact appropriately with others with the

exception of avoiding frequent or prolonged contract with the public, coworkers or

supervisors, and that Plaintiff is able to adapt to the stress of a workplace environment.

### *Tuolumne General Hospital - Imaging Reports*

An October 1, 2003, report following x-ray includes findings of mild wedging at

T11, T12 and L1.  Otherwise, the findings were normal.  The clinical impression

was"[s]ubtle, old compression fractures of T11, T12 and L1 with secondary hypertrophic

changes."  AR 496.

On October 7, 2003, Plaintiff underwent a CT scan of his lumbar spine due to an

abrupt onset of bilateral sciatica.  James G. Rohn M.D.'s impression states "[l]eft

posterolateral disc protrusion at L2-3 (mild) and broad disc bulges at L3-4, L4-5 and L5-

S1.  [A]t L5-S1 there is a slightly more prominent focal central component producing a

slight impression on the thecal sac and upper sacral nerve roots which appear normal in

size."  AR 495.

### Allen Middleton, Ph.D.

On June 23, 2004, a third Psychiatric Review Technique Form was completed by psychologist Allen Middleton.  AR 510-523.  Dr. Middleton determined Plaintiff suffers from a medically determinable impairment that does not precisely satisfy the diagnostic criteria of Listing 12.03.  The doctor noted a mild psychotic disorder that responded well to treatment.  AR 512.  With regard to mental retardation, Dr. Middleton again found that Plaintiff's borderline intellectual functioning did not precisely satisfy the diagnostic criteria of Listing 12.05.  AR 514.  Regarding both Listing 12.03 and 12.05 "B" criteria, Dr. Middleton assigned a mild degree of functional limitation in the areas of restriction of activities of daily living and difficulties in maintaining social function.  The doctor assigned a moderate limitation regarding Plaintiff's difficulties in maintaining concentration, persistence and pace.  Plaintiff was not limited by episodes of decompensation.  AR 520.  Dr. Middleton determined the evidence did not establish the presence of "C" criteria.  AR 521.  In the consultant's notes portion, Dr. Middleton noted, *inter alia*, that there is "minimal evidence of schizophrenia."  AR 522.

Dr. Middleton also completed a Mental RFC assessment dated June 23, 2004.  AR 506-508.  The assessment indicated that Plaintiff was moderately limited in his ability to: understand and remember detailed instructions, and to interact appropriately with the general public.  However, Plaintiff was not significantly limited in all other categories. AR 506-507.  Dr. Middleton concluded the assessment by opining that Plaintiff had cognitive functions sufficient to understand and carry out simple tasks; the ability to concentrate sufficient to sustain substantial gainful activity at work within his cognitive ability; and the ability to recognize normal work hazards and make modest work changes. Lastly, the doctor noted that Plaintiff would work best alone or in a small group with limited public contact.  AR 508.

### Katharina Truelove, M.D.

Plaintiff was examined by Katharina Truelove, M.D., a staff physician at Tuolumne County Mental Health, on two occasions.  AR 570-571, 580, 613-14.  The first

17

examination addressed Plaintiff's elevated blood pressure, cholesterol and glucose levels, but also commented on his back pain.   AR 613.   In her objective observations, Dr. Truelove stated "[Plaintiff is morbidly obese, alert and oriented, in no acute distress." AR 613.   Her assessment indicates that with medication, Plaintiff's elevated blood pressure, cholesterol and glucose levels are treatable.   *Id*.   With regard to Plaintiff's back, a CT scan conducted in October of 2003 evidencing "disc bulges" resulted in Dr. Truelove's opinion that his "disability [will] be temporary" and Plaintiff would be capable of returning to work July 1, 2004.   AR 613.

On November 22, 2004, during a follow-up visit, Dr. Truelove performed a second examination.   AR 570-571.   It was noted that Plaintiff was not taking his hypertension medication as directed.   On this occasion, Plaintiff presented the doctor with disability papers and indicated he had never applied for disability.   However, the doctor noted her own review of the file established otherwise.   Plaintiff then admitted he had previously applied for disability but had been denied.   AR 570.   The doctor concluded her assessment as follows:

> Regarding his disability, I did fill out his disability forms.  There are two of them saying he would probably be disabled for another month, but indicating that a large reason for his disability is because he has been noncompliant with appointments, referrals, medications, etc., and that the true underlying cause of his disability may, in fact be related to psychological issues rather than physical ones.

AR 570-571.   On November 25, 2004, Dr. Truelove noted in a medical report that Plaintiff had been non-compliant with his recommended treatment.   Further, the doctor noted: "[p]oor prognosis since [Plaintiff] does not seem to want to get better."   AR 580.

### Les P. Kalman, M.D.

On January 19, 2005, after initially reviewing most of Plaintiff's medical file, board eligible psychiatrist Les P. Kalman, M.D. conducted a  psychiatric evaluation of Plaintiff.   AR 625-632.   He observed that Plaintiff's posture and gait were normal and noted no involuntary movements.   AR 625.   His examination noted that Plaintiff: was pleasant and cooperative; alert and oriented as to person, place, time and situation;

memory impaired; and capable of taking care of his personal hygiene.  AR 626-627.  Dr.
Kalman concluded that Plaintiff was incompetent to manage his own funds, but the
doctor's prognosis expected Plaintiff's condition to improve significantly within the
twelve months to follow, unless he were to "get on other and higher doses of atypical
neuroleptics."  AR 627.

In his source statement rating of the nature and severity of Plaintiff's mental
impairment, Dr. Kalman indicated that Plaintiff was moderately limited in his ability to:
understand, remember, and carry out detailed (three or more steps) instructions; maintain
attention and concentration for extended periods (approximated to be two hours);
complete a normal workday and workweek without interruptions from psychologically
based symptoms, and perform at a consistent pace without an unreasonable amount of
rest periods and length of rest periods; accept instruction and respond appropriately to
criticism from supervisors; and get along with co-workers or peers without unduly
distracting them or exhibiting behavioral extremes.  AR 630-631.  The doctor found
Plaintiff to be mildly limited in all the other sub-categories listed, most notably was
Plaintiff's ability to: understand, remember, and carry out short and simple (one- or two-
step) instructions; sustain an ordinary routine without special supervision; make simple
work related decisions; ability to interact appropriately with the general public or
customers; ask simple questions or request assistance from a supervisor; maintain socially
appropriate behavior and to adhere to basic standards of neatness and cleanliness; and
respond appropriately to expected or unexpected, changes in the work setting.  AR 630-
631.

Dr. Kalman concluded his assessment by indicating that Plaintiff is not "the type
of person for whom a routine, repetitive, simple, entry-level job would serve as a stressor
which would *exacerbate* instead of mitigate psychological symptoms in the workplace."
AR 631, emphasis in original.

1

***Stepfan Lampe, M.D.***

2        On April 28, 2008, board certified psychiatrist Stephan Lampe, M.D. performed a

3  consultative psychological examination.  AR 667-668.  Dr. Lampe's examination of

4  Plaintiff took into consideration Plaintiff's own reported history of schizophrenia,

5  depression, auditory and visual hallucinations, paranoia, isolation and insomnia, as well

6  as the doctor's own observations.  The doctor stated, in part:

7            From a psychiatric point of view, [Plaintiff] should be able to relate and
            interact with supervisors and co-workers.  He can understand, remember
8            and carry out simple instructions.  He may have difficulty with more
            complex instructions.  He may have some difficulty with the public.  He is
9            able to maintain concentration and attention for two-hour increments.
            Whether or not he would be able to withstand the stress and pressures
10           associated with an eight-hour work day on an ongoing basis would depend
            on the skills necessary and supervision.

11

12  AR 668.

13        Dr. Lampe also completed a Medical Source Statement, indicating Plaintiff was

14  markedly limited in his ability to make judgements on simple or complex work-related

15  decisions, and understand, remember and carry out complex instructions.  AR 669.  The

16  doctor also opined that Plaintiff was moderately limited in his ability to: interact

17  appropriately with the public, and respond appropriately to usual work situations and

18  changes in a routine work setting.  AR 670.  Finally, the doctor noted mild limitation in

19  Plaintiff's ability to understand, remember, and carry out simple instructions, and interact

20  appropriately with supervisors and co-workers.  AR 669-670.

21  ***Cesar P. Duclair, M.D.***

22        On May 3, 2008, Cesar Duclair, M.D., a board certified physical medicine and

23  rehabilitation orthopedist, performed a consultative examination of Plaintiff pertaining to

24  his various physical limitations.  AR 672-673.

25        Based on his examination and the medical history provided by Plaintiff, Dr.

26  Duclair diagnosed Plaintiff with morbid obesity, possible diabetic neuropathy, and

27  hypertension; he also specifically noted that there was no evidence of lumbar spine injury.

28  AR 673.  The doctor's examination revealed that Plaintiff's gait was nonantalgic, but

laborious secondary to his weight; he did not use an assistive device.  The range of motion in Plaintiff's upper and lower extremities was normal, and despite Plaintiff's complaints of lumbar spine pain, Dr. Duclair found no trigger points or deformities.  The doctor also noted that the depressions which Plaintiff indicated caused pain were normal.  AR 672-673.  Dr. Duclair's functional capacity assessment indicated that Plaintiff was capable of standing or walking for six hours out of an eight-hour day, secondary to his diabetic neuropathy and possibly lumbar injury.  Plaintiff was unlimited in the ability to sit and had no need for an assistive device regardless of distance or terrain.  Plaintiff was unlimited in his ability to lift and carry, and despite his possible lumbar injury, his strength was unaffected.  Lastly, the doctor did not identify any postural, manipulative, visual, communicative, or environmental limitations.  AR 673.

Dr. Duclair completed a medical source statement regarding Plaintiff's ability to work.  The doctor opined that Plaintiff had the ability to: lift and carry zero to fifty pounds continuously, and fifty-one to one hundred pounds frequently; sit for eight hours total and without interruption; stand for four hours without interruption and up to six hours throughout the course of an eight-hour work day; walk for two hours without interruption and up to four hours throughout the course of an eight-hour work day.  AR 674-679.  Dr, Duclair opined that Plaintiff was otherwise not physically limited.  *Id*.

### *Lillian Boone, M.D.*

On March 31, 2008, Lillian Boone, a staff psychiatrist at Tuolumne County Behavioral Health who treated Plaintiff for his mental conditions, completed a verification of disability form pertaining to Plaintiff's food stamp eligibility, and deemed that Plaintiff was "not . . . unfit" for gainful employment based upon the following: 1) post traumatic stress disorder, 2) history of attention deficit disorder; 3) recurrent major depression with psychosis; 4) schizoid personality traits; 5) schizophrenia; and 6) dyslexia.  AR 643.

On April 29, 2008, Dr. Boone saw Plaintiff during a routine follow-up medication evaluation.  Dr. Boone indicated that Plaintiff was compliant with his medications, and

that the medications were effective.  AR 696.  However, she also indicated that Plaintiff

exhibited only minimal progress.  *Id.*

Then, on May 15, 2008, Dr. Boone completed a "Mental Residual Functional

Capacity Questionnaire" form.  She noted Plaintiff was attending weekly psychotherapy

sessions as of March 31, 2008, but had missed a few psychiatric evaluation "due to fear

of process."  Asked to describe "*clinical findings* including results of mental status

examination[s]," Dr. Boone noted the following:

> Recurrent memories of alleged sexual abuse in childhood.
> Anxious.  Pt. says he feels depressed about being unemployed.  Multiple
> fears re people in general, apprehension, mildly impaired attention span,
> moderately impaired insight and judgment.  Past hx of multiple suicide
> attempts since age 4 y.o.

AR 681.

On May 21, 2008, Dr. Boone completed a mental report documenting the impact

Plaintiff's mental condition has on his work-related activities.  AR 686-687.  Her

assessment indicates that Plaintiff has a fair ability (i.e. limited, but satisfactory ability)

to: follow work rules, use judgement, maintain his personal appearance; behave in an

emotionally stable manner, and understand, remember and carry out simple instructions.

*Id.*  The doctor also opined that Plaintiff has a poor ability (i.e. serious limitation, but not

preclusion) to: relate to co-workers deal with the public, interact with supervisors, deal

with work stress, function independently, maintain attention and concentration;

understand, remember and carry out either detailed or complex instructions; demonstrate

reliability, and relate predictably in social situations.  *Id.*

### ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity

since October 15, 2003, and had the severe impairments of obesity, diabetic neuropathy,

and schizophrenia.  AR 24.  Nonetheless, the ALJ determined that none of the severe

impairments met or exceeded one of the listing impairments.  AR 25.

Based on his review of the medical evidence, the ALJ determined that, Plaintiff

had the RFC to perform medium work as defined by the regulations, with the limitation

that he is not able to work around heights or hazards such as moving machinery, and must avoid dust, smoke, fumes and other environmental respiratory irritants.  Further, Plaintiff is limited to work involving simple, repetitive tasks with limited public contact.  AR 26-30.  The ALJ found that Plaintiff could not perform his past relevant work.  AR 30. Nevertheless, the ALJ determined that Plaintiff had the RFC to perform other jobs that exist in significant numbers in the national economy.  AR 30-31.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a

physical or mental impairment of such severity that he is not only unable to do her

previous work, but cannot, considering his age, education, and work experience, engage

in any other kind of substantial gainful work which exists in the national economy.

*Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the

claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has

promulgated regulations which contain, inter alia, a five-step sequential disability

evaluation process.  20 (C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this

process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial

gainful activity since the alleged onset of his disability; (2) has an impairment or a

combination of impairments that is considered "severe" based on the requirements in the

Regulations (20 CFR §§ 404.1520(c) & 416.920(c); (3) does not have an impairment or

combination of impairments which meets or equals one of the impairments set forth in 20

C.F.R., Part 404, Subpart P, Appendix 1; (4) was unable to perform any past relevant

work; yet (5) retained the RFC to perform other jobs that exist in significant numbers in

the national economy.  AR 22-31.

Plaintiff argues that (1) the ALJ failed to acknowledge the opinions of

consultative examiners and non examining medical experts that conflicted with his RFC

determination, improperly credited physician opinions that lacked a review of the medical

record, and mischaracterized other medical opinions; and (2) the ALJ applied the

incorrect standard regarding mental retardation.  (Doc. 21 at 10-17.)

## DISCUSSION

### A.    *Legal Standard Regarding Mental Retardation*

Plaintiff asserts the ALJ applied an improper legal standard in analyzing Listing

12.05C.  More particularly, Plaintiff complains that the Verbal IQ score of 69 assigned by

Dr. Ball falls within the listing requirements and requires a finding of disability despite

the lack of an IQ score obtained before Plaintiff turned 22 years of age because there is

evidence to support the existence of deficits in adaptive functioning prior to that age.

(Doc. 21 at 17-20.)

The Disability Evaluation Under Social Security (Blue Book September 2008) defines mental retardation as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> OR
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
> OR
> C.  *A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function*;
> OR
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.  Repeated episodes of decompensation, each of extended duration.

Emphasis added. *See* http://www.ssa.gov/disability/professionals/bluebook/12.00.

In a psychological evaluation of January 9, 2003, Dr. Ball administered the Wechsler Adult Intelligence Scale-III (WAIS-3) and the Wide Range Achievement Test-III (WRAT-3).  AR 401.  The scaled scores following the WAIS-3 testing yielded a Verbal IQ score of 69.  The Performance IQ was 78 and the Full Scale IQ was recorded to be 71.  AR 401.  The reading portion of the WRAT-3 testing yielded a standard score of 58 with a grade level equivalent of second grade.  AR 401.

In his findings, the ALJ determined as follows:

> I have considered the IQ test results obtained in 2003, giving the claimant a Full Scale IQ of 71, Verbal IQ of 69 and Performance IQ of 78. Listing 12.05 considers significantly subaverage general intellectual functioning, with deficits in adaptive functioning, generally manifested during the developmental period, before age 22.  The claimant's IQ scores fall around the ranges provided in 12.05C and D, IQ scores 60-70.  Those

sections require IQ scores within the stated range, and a physical or other mental impairment that imposes additional and significant work related limitation of function or marked restrictions in at least two areas of performing activities of daily living, maintaining social functions, maintaining concentration, persistence or pace, or documentation of repeated episodes of decompensation. *There is no medical evidence showing that the claimant was diagnosed or assessed as being mentally retarded before age 22 or at any time during his adolescence. IQ scores can vary somewhat, depending on mental status at the time of the evaluation. The test was administered at the time the claimant was admittedly addicted to methamphetamine, so it is certainly possible that his drug addiction had some affect on the test results.*

AR 29, emphasis added & internal citations omitted.

Initially, the Court notes it is troubled by the last sentence above wherein the ALJ indicated the test was administered at a time when Plaintiff was "admittedly addicted to methamphetamine" and that it "had some affect on the test results."  Dr. Ball's report provided information to the contrary: Plaintiff denied any current drug or alcohol problem, indicating he had been "clean and sober" for four months.  AR 400.  In fact, the doctor's report indicated Plaintiff "was cooperative and no extraneous movements were noted."  AR 400.  There is simply no reason to question the validity of the IQ scores, and in particular, there is no basis to do so where the ALJ offers nothing but pure speculation.

The Ninth Circuit has not adopted the rebuttable presumption that some circuits have regarding mental retardation:  that a valid adult IQ score is entitled to a presumption that the impairment existed during the claimant's developmental phase, or before 22 years of age.  However, several other circuit courts have adopted a *per se* rebuttable presumption.  *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (IQ tests after age 22 satisfy the listing criteria and "create a rebuttable presumption of a fairly constant IQ throughout life"), citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) and *Luckey v. U.S. Dept. Of Health and Human Services*, 890 F.2d 666, 668 (4th Cir. 1989).  The Third and Sixth Circuits have not adopted a *per se* presumption and require that the record contain some evidence of the deficit prior to the age of 22 years.  *See Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001); *Markle v. Barnhart*, 324 F.3d 182, 189 (3rd Cir. 2003).

Within the Ninth Circuit, several district courts have cited to the rebuttable presumption favorably. *Jackson v. Astrue*, 2008 WL 5210668 (C.D. Cal., Dec. 11, 2008) at *6 ("several circuits have held that valid IQ tests create a rebuttable presumption of a fairly constant IQ throughout a claimant's life . . .. The Court finds the reasoning of the Seventh, Eighth, and Eleventh Circuits to be persuasive"); *Schuler v. Astrue*, 2010 WL 1443882 (C.D. Cal., April 7, 2010) at *6 (citing *Hodges, Muncy* and *Luckey* for the proposition "that a valid qualifying IQ score obtained by the claimant after age 22 creates a rebuttable presumption that the claimant's mental retardation began prior to the age of 22, as it is presumed that IQ scores remain relatively constant during a person's lifetime"); *Walberg v. Astrue*, 2009 WL 1763295 (E.D. Wash., June 18, 2009) at * 8 (citing *Hodges* favorably but examining whether evidence in the record is supportive of early onset impairment). In the Eastern District of California, the courts have been reluctant to adopt the presumption. *See Rhein v. Astrue*, 2010 WL 4877796 (E.D. Cal., Nov. 23, 2010) at *8; *Lawson v. Astrue*, 2010 WL 961722 (E.D. Cal., March 16, 2010) at *5.

Nonetheless, this Court is persuaded by the reasoning in those cases that support a rebuttable presumption that a valid adult IQ score is evidence of impairment during the claimant's developmental phase. Here then, Plaintiff would be entitled to a rebuttable presumption that the valid Verbal IQ score of 69 obtained when he was about 25.6 years old is evidence of impairment prior to the age of 22.

Notwithstanding, assuming this Court declined to adopt a *per se* presumption, there is evidence in this record to support a finding that the onset preceded the age of 22. Here, Plaintiff testified that the last grade he completed was the nine or tenth grade. He did not earn either a diploma or a GED. AR 137; *see also* AR 79. A review of his official transcript from Summerville High School in Tuolumne, California, is revealing. In the ninth grade, Plaintiff earned three "D's" and nine "F's" yet managed to promote to the tenth grade. In his second year of high school, he earned four "C's," six "D's," and an "F." In the eleventh grade, prior to eventually withdrawing from high school, his marks included four "D's" and two "F's." A handwritten notation indicates Plaintiff

participated in "SDC=Special Day Class."[8]   In total, he earned 85 of 145 credits

attempted, with an academic grade point average of 0.72.  Plaintiff did not complete the

competency examinations in reading, writing or mathematics.  AR 301.  Taking the latter

subjects only - reading, writing and math - Plaintiff never earned above a "D" in these

subjects, and in fact failed all three subjects his first year of high school.  This is clearly

circumstantial evidence of a deficit in adaptive functioning.[9]   Courts have found that

circumstantial evidence can infer a deficit in adaptive functioning prior to the age of 22.

Examples of such evidence includes attendance in special education classes, dropping out

of high school prior to graduation, difficulties in reading, writing or math, and low skilled

work history.  *See, e.g., Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007); *Gomez v.

Astrue*, 695 F.Supp.2d 1049 (C.D. Cal. 2010); *Payne v. Astrue*, 2010 WL 654319 (D.

Ariz., Feb. 23, 2010) at *11.

In sum, Plaintiff attended special education classes, dropped out of high school

before graduation, and had great difficulty with core subject matter.  Moreover, a review

of Plaintiff's yearly earnings is evidence of his low skilled work history.  *See* AR 281-285

(highest annual earnings were $4,630.83).  Considering the foregoing together with

Plaintiff's Verbal IQ score of 69, this Court finds that the onset of Plaintiff's mental

retardation occurred prior to the age of 22.

The second prong of Listing 12.05C requires an examination of Plaintiff's

impairments and their impact on his ability to work.  ALJ Thompson failed to address the

second prong altogether in his findings.  *See* AR 29.  Nevertheless, the ALJ previously

found Plaintiff's severe impairments to include obesity, diabetic neuropathy and

---

[8]Plaintiff's sister recalled that Plaintiff attended special education classes, earned poor grades and could not keep a job.  AR 387-388.

[9]Additionally, but for one example in this lengthy record, a Disability Report - Field Office reflects Plaintiff had difficulty understanding, concentrating on and answering questions during the interview.  A further observation reads as follows: "Mr. Campbell could not answer many of the questions.  He had to ask his wife about dates until he just gave her the phone to answer the questions.  She said he is unable to drive because he can not read."  AR 299.

schizophrenia. AR 24.[10] Thus, a finding of severe impairment at step two is a *per se* finding of "impairment imposing additional and significant work-related limitation of function" as employed in the second prong of Listing 12.05C. *See Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987); *Huber v. Astrue*, 2010 WL 4684021 (D. Ariz., Nov. 12, 2010) at *2; *Rowens v. Astrue*, 2010 WL 3036478 (E.D. Cal., Aug. 2, 2010) at *3; *see also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *Edwards v. Heckler*, 736 F.2d 625, 629-31 (11th Cir. 1984); *Nieves v. Secretary of Health & Human Servs.*, 775 F.2d 12, 14 & n. 7 (1st Cir. 1985).

**B.    *Reversal with Award of Benefits is Appropriate***

The decision whether to remand a matter pursuant to sentence four of Title 42 of the United States Code section 405(g) or to order immediate repayment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002). Generally, an award of benefits is directed only where no useful purpose would be served by further administrative proceedings or where the record is fully developed. *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988).

In this case, and for reasons given above, the Court finds no useful purpose would be served by further administrative proceedings. In fact, the matter has been remanded previously to address this very issue yet the ALJ failed to do so. Additionally, this Court finds the record to be fully developed. Plaintiff has established that he meets the listing for mental retardation and is therefore "presumed disabled, and no further inquiry is necessary." *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991).

---

[10]Previously, the ALJ identified "a schizoaffective disorder" as one of Plaintiff's severe impairments. AR 737.

1   Finally, in light of this decision, the Court did not consider Plaintiff's remaining

2   argument.  *See Byington v. Chater*, 76 F.3d 246, 250-51 (9th Cir. 1996) ("Because we

3   find that the district court committed error and the decision of the ALJ is supported by

4   substantial evidence, we do not consider the [] other arguments on appeal").

5                                          **<u>CONCLUSION</u>**

6          Based on the foregoing, the Court finds that the ALJ's decision is not supported

7   by substantial evidence in the record as a whole and is not based on proper legal

8   standards.  Accordingly, this case is REMANDED to the Commissioner of Social

9   Security for a calculation of benefits only.  The Clerk of this Court is DIRECTED to enter

10  judgment in favor of Plaintiff Steven J. Campbell and against Defendant Michael J.

11  Astrue, Commissioner of Social Security.

12

13    IT IS SO ORDERED.

14  **Dated:    February 8, 2011                            /s/ Gary S. Austin          **
                                                    UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28